UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALICE MARIE DAY,

                            Plaintiff,                               <u>COMPLAINT</u>

     -against-

                                              PLAINTIFF DEMANDS
                                             <u>A TRIAL BY JURY</u>

WELLS FARGO BANK, N.A.,

                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Alice Marie Day ("Day" or "plaintiff"), by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendant Wells Fargo Bank, N.A. ("Wells Fargo," the "Bank," or "defendant") as follows:

NATURE OF CLAIMS

1.      For decades, Day, a 58-year-old Black woman, has had a successful career in public policy and government relations for financial services institutions.

2.      During her over 15-year tenure at Wells Fargo, Day successfully managed relationships with many non-profits and NGOs with whom the Bank had important partnerships. Day also led the development of several new strategies and initiatives that improved the Bank's ability to coordinate and evaluate such relationships efficiently. Day's outstanding performance did not go unnoticed, and she, with one notable exception discussed below, consistently received positive feedback and merit-based compensation in recognition of her achievements.

3.      In early 2020, Day filed a race discrimination complaint against her supervisor, Eric Hoplin ("Hoplin"), who is white, due to offensive stereotyping in his 2019 review of

her performance. After the Bank revised Day's incentive compensation to appropriately take into consideration her contributions, on information and belief, the Bank asked Hoplin to leave.

4.      In January 2021, Alison Hawkins ("Hawkins"), a white woman who is in her thirties, became Day's supervisor. Hawkins and Hoplin were close personally and had worked together for several years, including before joining the Bank. In fact, Hoplin was responsible for bringing Hawkins to Wells Fargo. Hawkins was Hoplin's first external relations hire and a direct report.

5.      After Hawkins became Day's supervisor, Hawkins began discriminating and retaliating against Day by, inter alia, diminishing her role and responsibilities. Hawkins targeted Day because, on information and belief, Hawkins blamed Day for Hoplin's departure from the Bank following Day's race discrimination complaint. Hawkins also discriminated against Day due to her race and age. In contrast to her treatment of Day, Hawkins promoted and supported Day's younger and white colleagues.

6.      On July 11, 2023, Hawkins abruptly fired Day. The stated explanation for firing Day was pretext for unlawful discrimination and retaliation. Hawkins claimed that Wells Fargo was restructuring Day's group. Later, the Bank shifted its explanation by claiming that the Bank had eliminated Day's job because it was supposedly no longer necessary. Contrary to those assertions, the Bank posted a job opening for Day's role within a short time after firing her and hired someone to replace her. Moreover, out of approximately 40 employees within Day's division, the Bank only laid off two individuals, including her. There was no restructuring or job elimination. Instead, the Bank fired Day because she is Black, in her late fifties, and made protected discrimination complaints.

7.      Plaintiff brings this action to remedy discrimination on the basis of her race and retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

8.      Plaintiff also brings this action to remedy discrimination on the basis of her age in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. (the "ADEA").

<u>THE PARTIES</u>

9.      Day worked for defendant and its predecessor from March 2008 until defendant fired her on July 11, 2023.

10.     Wells Fargo Bank, N.A. is a national banking association that maintains its main office in the State of South Dakota.

<u>JURISDICTION AND VENUE</u>

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiff's Section 1981, Title VII, and ADEA claims arise under federal law.

12.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332. First, the parties have diversity of citizenship. Plaintiff is domiciled in North Carolina. Pursuant to 28 U.S.C. § 1348, Wells Fargo is incorporated in the State of Delaware and maintains its main office in the State of South Dakota. Second, the amount in controversy exceeds $75,000.

13.     Venue is proper in the Southern District of New York pursuant to 42 U.S.C. § 2000e-5(f)(3) because Plaintiff alleges that executives and HR representatives in New York, New York ultimately approved the discriminatory and retaliatory decision to fire her and Day's

3

employment records were maintained in New York, New York. Wells Fargo also has headquarters in New York, New York, where the CEO and other executives are based.

14.     Venue is also proper in the Southern District of New York pursuant to 42 U.S.C.  § 1391(b) because Wells Fargo does business in New York and a substantial part of the events giving rise to the discrimination and retaliation claims occurred in New York, including, but not limited to, an executive and HR representative reviewed and/or approved plaintiff's unlawful firing.

BACKGROUND

Plaintiff's Public Policy and Government Relations Career

15.     Day is an accomplished public policy professional with over 20 years of experience working in government relations for banks.

16.     Day graduated from the Catholic University of America Columbus School of Law in 1996.

17.     After law school, Day worked in government for approximately seven years.

18.     Among other jobs, Day worked as a Special Assistant to the Deputy Chief of Staff in the office of the Governor of Maryland.  In this role, Day managed oversight of several State agencies; prepared briefing materials on policy developments for administration officials, including the Governor; and presented recommendations on State legislation.

19.     Approximately a year later, Day became Deputy Chief of Staff to the Lieutenant Governor of Maryland. Day helped manage office operations, assisted in the development of administrative policy and budgets, and served as the Lieutenant Governor's liaison to other elected officials, local government representatives, and local businesses and special

4

interest groups. During this time, she developed strong relationships both in the public and private sectors.

20.     In 2003, Day took her first job in financial services.  She joined Bank of America as a Vice President of Mid-Atlantic Government Relations. Her duties included developing policy strategy; analyzing legislation related to the financial services industry; and developing and maintaining relationships with national, regional, and state legislative groups that were influential in the financial services industry. Day worked at Bank of America for approximately five years.

21.     In or around 2008, the Head of Wachovia's Government Relations and Public Policy team recruited Day to join that bank. On information and belief, the Head of Government Relations sought to hire her because she had gained the trust of government relations professionals in the financial services industry and because her experience, talent, and because she had demonstrated her ability to build relationships with state and local elected officials, which was a highly sought after skill set in the industry.

22.     Later that year, Wells Fargo acquired Wachovia Bank. Day was one of only two Wachovia Government Relations team members that Wells Fargo asked to remain with the Bank after the acquisition. Day was the only team member asked to remain who specialized at the state and local level. As set forth below, she continued working for Wells Fargo for over 15 years.

23.     In her first role at Wells Fargo, Day was a Senior Vice President of Government Relations. Her duties included leading the Bank's legislative efforts and helping develop the Bank's policy and positioning on new legislation in the financial services industry. Day was also responsible for helping orchestrate the Bank's compliance with certain newly enacted financial services laws and maintaining relationships with local, state, and federal officials.

24.     In 2010, Day secured a job working for another company and planned to leave Wells Fargo. Leaders from Wells Fargo's Home Mortgage Servicing Department, however, asked her to stay at the Bank. They specifically asked her to work on a new outreach division that the Bank created following the 2007-2008 financial crisis.

25.     Based on the efforts to convince her to stay, Day agreed to remain at the Bank. Between approximately 2010 and 2015, Day worked on the Wells Fargo Home Mortgage team.  During this time, Day successfully led a team in the Northeast region of the country.  Day helped the Bank's customers retain their homes and find solutions to avoid foreclosure. Her work included a focus on local governments as the foreclosure process is carried out at the municipal level.

26.     In 2015, the Bank asked most of the Home Mortgage Servicing Outreach Team led by Joe Ohayon ("Ohayon"), including Day, to return to the Bank's Government Relations and Public Policy team ("GRPP team"). The Bank's leadership asked Day and others to rejoin the GRPP team based on their positive contributions and valuable skills. Wells Fargo moved this group to GRPP so they could help a larger segment of the Bank.

27.     After Wells Fargo moved Day to the GRPP team, she had multiple supervisors.  From approximately 2010 until 2018, she reported to Ohayon, now the head of the State and Local Government Relations team. During this time, under Ohayon's leadership, Day was responsible for leading the buildout of a local government relations function for the Bank while also continuing other leadership responsibilities.

28.     In 2018, David Moskowitz ("Moskowitz") took over as the Head of the GRPP team. Moskowitz instituted a restructure and overhaul of the GRPP team. During the restructure, Moskowitz appointed Day to lead State and Local External Relations in the new

External Relations ("ER") division. Shortly thereafter, Hoplin took over as head of the External Relations team and reported to Moskowitz.

29.    Subsequently, in or around 2020, Brian Smith ("Smith") replaced Moskowitz as the Head of the Government Relations and Public Policy Team. Smith had also worked with both Hoplin and Hawkins before coming to Wells Fargo.

30.    The Government Relations and Public Policy Team fell under the umbrella of Public Affairs. During that time, William Daley ("Daley") was the Bank's Vice Chairman for Public Affairs. Daley's role was based out of New York, New York.

31.    The GRPP team was spread throughout the country. For example, Day's office was in North Carolina; Smith and Hoplin were in the Washington, D.C. area; and Hawkins was based in Utah. GRPP's Human Resources business partner, Lea Degirmenci, was based in New York, New York. On information and belief, Degirmenci was responsible for maintaining employment records for the GRPP team.

32.    As Lead of State and Local External Relations, Day reported to Hoplin and later Hawkins.

33.    During her time with the GRPP team, Day had numerous achievements and made important contributions.  By way of example only:

- Day was instrumental in developing and implementing a new strategy for the Bank's Government Relations and Public Policy team centered around relationships with local government and external partners.

- Day also created and organized a new approach to gather and report internal company data that was more efficient and reduced risk to the Bank.

- Moreover, during her tenure on the GRPP team, she developed an organized approach to working with national municipal organizations that support local elected officials. This helped the Bank determine and analyze the affect that those relationships had.

- Day also oversaw, created, and implemented many critical Wells Fargo initiatives with key state and local organizations including: overseeing and partnering with organizations concerning diversity efforts focused on race and equity (a top priority for the Bank at the time); working with colleagues on the Bank's climate team and stakeholders at the U.S. Conference of Mayors to prepare a whitepaper on environmental resilience at the municipal level; creating an initiative that targeted small businesses by working with municipal officials and municipal trade associations and organizations; and working with organizations on affordable housing studies.

- Day also organized webinars and engagement opportunities for high-level Wells Fargo executives and state and local elected officials.  Those events focused on issues in which Wells Fargo desired to be seen as a leader.

<u>The Bank Repeatedly Recognized Day's Success and Hard Work</u>

34.     Throughout Day's tenure at Wells Fargo, her supervisors praised her work, she received stellar performance reviews, and the Bank awarded her merit-based compensation.

35.     Day performed well in each of her roles, and, until the Bank changed the format of performance reviews, she received the highest possible rating each year of her employment between 2008 and 2015. Her supervisors consistently rated her performance as a five on a one-to-five scale with five being the best possible score.

36.    In 2016, the performance review format changed from a one-to-five scale to a format in which managers placed each employee into one of three buckets: Improvement Needed; Performing (also called "Meets"); and Exceeds. Wells Fargo informed managers that the number of individuals in the "Exceeds" category should be limited.

37.    In 2017, Ohayon gave Day a rating of "Performing," but the comments from her manager demonstrated that he was pleased with her performance and contained no negative feedback. For example, in her evaluation, her supervisor wrote, among other things, "Marie . . . was a key contributor to the overall success of the organization in 2017." He also wrote, "Marie's accomplishments were many . . . ."

38.    Day's 2018 performance review was equally strong. The evaluation was split into five categories, and she received a rating of "Exceeds" in each individual category. Hoplin nonetheless gave her an overall rating of "Performing."

39.    Day also consistently received annual incentive compensation that included both cash bonuses and restricted stock awards. Those annual incentive awards were based on, among other factors, her individual performance. Day's bonus target beginning in 2015 was 40% of her annual base salary. Each year of her employment, she received at least her target bonus and most years she received a bonus that exceeded her target in recognition of her contributions.

Demographics

40.    Throughout the time Day worked on the GRPP team between 2015 and 2023, the team was mostly white, including nearly all members of management.

41.    As set forth above, Moskowitz and later Smith served as the Head of the Government Relations and Public Policy Team. Both Moskowitz and Smith are white. Daley, who oversaw the GRPP team as Vice Chairman of Public Affairs, is white.

42.    Nearly all the individuals who reported directly to Moskowitz and later Smith are white, which included approximately five individual department heads. Both Hoplin and Hawkins are white. On information and belief, between 2015 and 2023, GRPP appointed only one Black employee, Gigi Dixon ("Dixon"), to a manager role. Dixon remained in that position for less than a year before the Bank reassigned her. No Black employees held management roles in GRPP at the time of Day's firing.

43.    In total, approximately 30 to 40 employees reported directly and indirectly to Smith as head of the GRPP group. Of those 30 to 40 individuals, at the time of Day's firing, she was one of only five Black employees and one of only two Black employees in a senior position.

44.    Furthermore, as described below, during Day's time reporting to Hawkins, she was the only Black employee on the ER team.

<u>Hoplin's Race Discrimination</u>

45.    As set forth above, for some time, Hoplin was the manager of the ER team and Day's direct supervisor. Beginning in 2019, Hoplin applied different standards to Day than he did to white employees.

46.    For example, Hoplin belittled Day on several occasions, including making multiple critical comments about her writing style in public that were baseless, not constructive, and only served to embarrass her.

47.    On one occasion, in 2019, Hoplin hosted an event for the ER team at his home in Virginia.  During the event, Hoplin presented Day with a large empty binder in front of her colleagues. When Hoplin gave her the binder, he said, in sum and substance, "This isn't big enough to fit an executive briefing written by Marie [referring to Day]." He made several other comments impugning Day's writing that evening. Hoplin's comments plainly made Day

uncomfortable. She did not laugh or participate in his antics. Day was so upset that she left Hoplin's party shortly after his remarks and did not take the large empty binder with her. One of Day's colleagues brought the binder to the D.C. office the next day. Her colleague acknowledged that Hoplin's comments at the party were disturbing and insulting and that obviously Day would not be taking the binder with her when she returned to Charlotte.

48.     Hoplin did not make similar demeaning comments about the work performance of younger and white employees in front of Day or her peers.

49.     Moreover, Hoplin discriminated against Day in his evaluation of her work for 2019. He rated her "Improvement Needed," a rating not reflective of her performance, and his written comments were based on discriminatory stereotypes about Black women. In the written evaluation, Hoplin referred to Day as "the hammer." He explained that colleagues supposedly interacted with her in a guarded way, including "waiting to get hit by the hammer," or that they did not interact with her at all "so as to avoid the hammer." Because Day had not heard any remotely similar feedback before, whether in her other roles at the Bank or from Hoplin himself, Day understood the criticism to be based on the stereotype of the "angry Black woman" rather than anything she had done. Hoplin also said multiple times, in sum and substance, that Day was too slow to keep up with the pace of work in the policy space. Given Day's decade-long track record of success in the policy space, Hoplin would only have made such comments if he assumed Day was not intelligent enough to perform the job. Such a view was not only patently untrue and offensive, but also plainly based on racist stereotypes about Black women.

50.     The discriminatory review Hoplin submitted had serious negative effects on Day's career and resulted in Day receiving a lesser bonus than she otherwise would have.

51.     In early 2020, with Moskowitz's encouragement and Hoplin's knowledge, Day complained to Human Resources that Hoplin's review was discriminatory based on her race. Human Resources investigated and fully restored Day's bonus to the expected level as if she had received a positive performance review. By doing so, Human Resources acknowledged that the review was inaccurate and unwarranted.

52.     Shortly after the Human Resources investigation, Hoplin left the Bank. On information and belief, the Bank asked Hoplin to leave.

53.     Wells Fargo initially appointed Dixon to manage the team after Hoplin's departure. In January 2021, the Bank reassigned Dixon elsewhere.

54.     Thereafter, Smith, the Head of the GRPP team, appointed Hawkins, whom he had previously worked with before coming to the Bank, to manage the External Relations team. Smith also designated Hawkins as his Chief of Staff at or around the same time.

<u>Hawkins Discriminated and Retaliated Against Day</u>

55.     After taking over as Day's supervisor in 2021, Hawkins immediately began treating Day worse than her peers. Hawkins continued discriminating against Day based on her race and age and retaliating against her for her protected activity until she fired Day for unlawful reasons in July 2023. Among other examples, Hawkins sabotaged Day's job and undermined her relationships with Bank clientele and partners.

56.     Hawkins treated Day differently in retaliation for her discrimination complaints against Hoplin. Hawkins and Hoplin have a close personal and professional relationship. On information and belief, Hawkins blamed Day for Hoplin's departure from the Bank based on her race discrimination complaint against him. As set forth above, on information and belief, the Bank asked Hoplin to leave shortly after the investigation concerning Day's race

discrimination concerns. On information and belief, Hawkins was angry with Day because Hawkins and Hoplin had worked together for so long and he had helped start her career at Wells Fargo.

57.    Hawkins also treated Day differently because of her race and age.

58.    When Hawkins took over the team, three individuals, including Day, reported to her directly. Hawkins hired two new employees, both significantly younger than Day and white, shortly into her tenure as head of the team.

59.    Of the five employees reporting directly to Hawkins, Day was the only Black employee. Day was also significantly older than the rest of the team, each of whom was in their mid-thirties or younger. Hawkins in particular liked to brag about being in her mid-thirties and having achieved so much success early in her career.

60.    Among other examples of Hawkins's mistreatment, Hawkins ignored Day on virtually all team GRPP Zoom calls. On several occasions, Hawkins failed to recognize Day as a member of her team during introductions or when acknowledging the team's work. Hawkins led many of the team Zoom calls as Smith appointed her his Chief of Staff. During these meetings, Hawkins frequently praised the other External Relations team members, who were younger and white and who had not made protected complaints, but not Day.

61.    Hawkins also was reluctant to meet with Day one-on-one. One-on-one meetings are an important and effective management tool used across the Bank to develop employees, improve relationships, and increase opportunities. On information and belief, Hawkins regularly met individually with Day's younger and white peers who had not made protected complaints.

62.    Further, Hawkins did not provide Day with the same opportunities that she offered to white and younger employees and employees who had not made protected complaints. Hawkins's actions damaged Day's standing within GRPP and throughout the Bank. Before Hawkins assumed her role as head of the ER team, Day had a positive reputation and strong relationships across the Bank, and her colleagues in other groups regularly sought her advice. After Hawkins took over, she severely limited Day's opportunities to interact with colleagues outside those in GRPP.  Hawkins also restricted Day's exposure and influence in other parts of the Bank by not offering opportunities to participate in assignments and initiatives that would allow Day to create and maintain relationships with colleagues outside the team. For example, Hawkins restricted Day from participating in new or ad hoc internal groups formed to deal with activist reaction to Wells Fargo. She failed to consult Day or rely on her experience with these groups and as a Black American. Instead, she minimized and isolated Day and sought advice from other Wells Fargo employees outside the team and external consultants.

63.    Hawkins gave these opportunities to the younger, white colleagues on her team who had not made protected complaints. As a result, Day went from being a well-known, trusted partner within the corporation to being unknown.

64.    Hawkins also took steps designed to diminish Day's role and sabotage her work. For example, Hawkins interfered with Day's responsibilities with the group's partner organizations. The Bank maintains relationships with many different organizations, public and private, in the government relations and public policy sphere. The Bank often collaborates with these organizations to generate goodwill with the communities that they represent, and also relies on those organizations to support Wells Fargo's legislative and policy preferences. A primary responsibility of the External Relations team is to work directly with those organizations. An

important part of Day's job was keeping up the Bank's relationships with several such organizations, particularly those connected to state and local government.

65.    One such partner organization with whom Day had a long-standing relationship was the National League of Cities ("NLC"), a group that advocates for the cities, towns, and villages in the United States. In or around Spring 2021, NLC's Executive Director approached Day to request the Bank's continued support for a proposal focused on race, equity, and leadership that they had implemented a few years earlier. Wells Fargo had sponsored all previous iterations of the program by providing philanthropic funds.

66.    Hawkins, however, was reluctant to support NLC's proposal and made Day ask NLC to make changes to their proposal multiple times. In 2022, there was a Zoom meeting to discuss the requested funding for this proposal. During the meeting, despite NLC having made several changes at Hawkins's request, Hawkins rudely tore down the proposal in front of NLC's Executive Director and his Deputy. Not only was her approach inappropriate and offensive, but her supposed concerns were baseless.  Hawkins demanded that any Bank funding for the proposal be tied to an obligation that NLC publicly support the Bank. Such a demand both violated the law and Bank policy. As a result of Hawkins's behavior, NLC representatives complained about her. The Executive Director for NLC expressed on multiple occasions that Hawkins's mistreatment had angered and embarrassed him.

67.    Hawkins's attack was contrary to the Bank's interests.  In Hawkins's haste to diminish Day for unlawful reasons, she failed to recognize the importance of the relationship with NLC. NLC and the Bank had over many years a successful partnership.  NLC had often stood up for Wells Fargo, and its brand, over objection of its members without any financial incentive to do so. NLC's membership is a critical constituency for the Bank as it includes municipal leaders

from across the country, i.e., mayors, city council presidents and representatives, city managers, chiefs of staff, etc. Ultimately, Hawkins tried to blame Day for her misstep and used it as a justification for taking over the relationship, particularly with NLC's Deputy.

68.    After damaging Day's relationship with the NLC Executive Director and Deputy Director by attacking the proposal, Hawkins made further efforts to undermine Day. For example, NLC's Executive Director wanted a one-on-one meeting with Daley, the Bank's Vice Chairman of Public Affairs. Day had repeatedly requested this meeting on NLC's behalf, but the Bank did not prioritize her request. After Hawkins took over the ER team, she ignored Day's request for over a year. On information and belief, Hawkins told Bank leadership that the meeting was not scheduled earlier due to errors by her "staff." Hawkins's reference to staff was clearly targeted at Day, as Day was the ER team member responsible for the NLC relationship.

69.    Once she successfully convinced internal and external partners that the failure was due to Day's inaction, Hawkins scheduled a meeting with NLC's Board and excluded Day from the meeting. Hawkins arranged to have Daley attend the NLC's Board meeting. She also included Smith and Ohayon in the meeting. By excluding Day from the meeting, Hawkins further reinforced the false narrative that Day was responsible for the delay in securing a meeting between NLC and Daley.

70.    Day never observed Hawkins behave in this manner towards Bank partners who worked with her white and younger colleagues and colleagues who did not complain about discrimination.

71.    This was not the only instance where Hawkins intentionally interfered with an existing relationship between Day and a partner organization.

72.    On multiple other occasions, Hawkins took away responsibility for maintaining a relationship with a partner organization from Day and reassigned the work to a younger, white colleague who had not made protected discrimination complaints. Hawkins claimed in multiple instances that she did so because she wanted a "Republican" to manage the relationship.  This explanation, however, was not credible and was outside of the Bank's long-standing relationship model, in which an employee's political affiliation was never considered. The Bank had considered developing relationships with all political parties as critical to its success. As a result, Day prided herself on being someone who acted solely as a Wells Fargo representative and not a member of a political party. Day did not discuss her political affiliation with the Bank's external partners or with Hawkins, nor was it relevant to her work. Hawkins merely assumed Republican organizations would view Day as a Democrat because she is Black.

73.    Hawkins never limited herself, or the younger white employees or those who had not complained about discrimination on her team, from engaging with specific organizations or individuals based on their political affiliations (or assumed political affiliations based on their races), including organizations with ties to the Democratic party.

74.    On information and belief, Hawkins never removed any of Day's younger and white colleagues who had not made protected complaints from relationships with partner organizations.

75.    On several occasions, Day complained about Hawkins's discriminatory treatment and lack of support to Ohayon, Hawkins's peer. Ohayon agreed that Hawkins was not adequately supporting Day or allowing her to lead external relations with state and local governments, which was supposed to be one of her primary duties.

76.     On information and belief, Ohayon did nothing in response to Day's concerns about Hawkins's unlawful treatment.

Wells Fargo Fired Day Because of Her Race, Age, and Discrimination Complaint

77.     On July 11, 2023, Hawkins invited Day to a Zoom meeting. When Day joined the call, Hawkins was present with Shannon Aimone ("Aimone"), a younger, white woman who is the head of political programs for the Government Relations and Public Policy team and Hawkins's peer.

78.     Hawkins immediately told Day, in sum and substance, "I'm not going to prolong this, today is your last day with Wells Fargo. You are being displaced due to a restructuring."

79.     On information and belief, Daley, who oversaw public affairs, including the GRPP team, ultimately approved the decision to fire Day and did so from New York, New York. On information and belief, Degirmenci, the HR business partner for the GRPP team, also reviewed and/or approved the decision from New York, NY, where she is based.

80.     This explanation was pretext for unlawful discrimination and retaliation.

81.     First, Day had received no warning about the firing, and the Bank told her repeatedly that her dismissal had nothing to do with her performance.  To the contrary, throughout Day's employment, she made important contributions and received praise for her hard work.

82.     Second, the Bank contradicted its own explanation. Hours after the meeting where Hawkins told Day that the Bank was firing her, Day received a written notice of her dismissal. The written notice did not mention a restructuring but, instead, stated that the Bank was firing Day due to "job criticality."

83.    Third, on information and belief, there was no restructuring of the Government Relations and Public Policy team in July 2023. On information and belief, of the approximately 40 individuals reporting directly and indirectly to Smith, Day was one of only two employees that the Bank fired.

84.    Fourth, two weeks after Day's dismissal, Wells Fargo made clear that it viewed her job as critical. Hawkins posted a job opportunity on the Bank's website that was nearly identical to the job Day was doing before the Bank fired her. Making modest attempts to cover its tracks, the Bank changed the name of the position to include the word "Federal." At the time the Bank fired Day, she was already engaging with stakeholders in the Bank's federal portfolio as a typical part of her role even though it was not part of her title. Also, the job listing stated Washington, D.C. was the "preferred location," but in an email to stakeholders, many of whom had previously worked with Day, about the position, Hawkins said she would consider other locations such as Charlotte, North Carolina. During her tenure with Wells Fargo, Day often worked from Wells Fargo's offices in Charlotte, North Carolina. Moreover, no one at the Bank ever asked Day if she was interested in relocating to Washington, D.C.

85.    Fifth, at the same time that the Bank fired Day, the Bank elevated a younger, white employee, Aimone, and assigned her new responsibilities. In Aimone's new role overseeing international public policy, she also took on a new dotted-line reporting relationship to Daley, the Bank's Vice Chairman of Public Affairs. This was a promotion. Aimone has significantly less experience than Day does in public policy. Aimone's core expertise is political fundraising via workplace political action committees ("PACs") and not public policy.

86.    To add insult to injury, the Bank timed Day's firing to ensure that she would not receive her annual bonus, which was a large percentage of her compensation each year of her

tenure with the Bank. The Bank's policy specifies that if an employee is discharged on September 30 or later, that employee is eligible to receive his or her bonus. The Bank told Day on July 11, 2023 that she would be fired and her last day would be 60 days later, so Day's 60-day notice period expired on or about September 9, just weeks before the start of the fourth quarter. As a result, despite working over half the year in 2023, Day did not receive any bonus payment.

87.    Shortly after the Bank unlawfully fired Day, she raised concerns about unlawful discrimination and retaliation via her counsel. In response, the Bank conducted a so-called investigation in which the outcome was already determined.  The purported investigation went on for months. On information and belief, even though Day provided names of relevant witnesses, the Bank did not speak to those individuals.  The Bank's pre-ordained conclusion that no discrimination occurred was confirmed following this investigation.  The investigation results shared with Day make clear that the Bank did not meaningfully examine what led to her dismissal and based its conclusion on misleading information.

<u>Wells Fargo Continued to Discriminate Against Day</u>

88.    The discriminatory and retaliatory decision to fire Day seriously damaged her financially and professionally.

89.    Moreover, Wells Fargo has continued to retaliate against Day since she raised concerns that that the Bank fired her because of her age, race, and protected activity.  For example, per Wells Fargo policy, Day is entitled to certain benefits after departing the Bank due to her age and length of service. Included in those benefits is Day's entitlement to certain Restricted Share Rights ("RSRs"). Wells Fargo has taken several steps to restrict Day's access to those RSRs, including removing them from her account without her permission. The Bank also denied Day access to career transition benefits she was entitled to under Bank policy until Day, through

counsel, complained that Wells Fargo was improperly denying her benefits. On information and belief, Wells Fargo has done so to retaliate against Day for raising discrimination and retaliation concerns related to her firing.

FIRST CAUSE OF ACTION
Discrimination Under Section 1981

90.    Plaintiff repeats and realleges paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91.    By the acts and practices described above, defendant subjected plaintiff to unlawful race discrimination in violation of Section 1981.

92.    Defendant acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

93.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

SECOND CAUSE OF ACTION
Retaliation Under Section 1981

94.    Plaintiff repeats and realleges paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.    By the acts and practices described above, defendant subjected plaintiff to unlawful retaliation in violation of Section 1981.

96.    Defendant acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

97.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

### THIRD CAUSE OF ACTION
Discrimination Under Title VII

98.    Plaintiff repeats and realleges paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.    By the acts and practices described above, defendant subjected plaintiff to unlawful race discrimination in violation of Title VII.

100.    Defendant acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

101.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

### FOURTH CAUSE OF ACTION
Retaliation Under Title VII

102.    Plaintiff repeats and realleges paragraphs 1 through 101 of this Complaint as if fully set forth herein.

103.    By the acts and practices described above, defendant subjected plaintiff to unlawful retaliation in violation of Title VII.

104.    Defendant acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

105.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's retaliatory practices.

## FIFTH CAUSE OF ACTION
Discrimination Under ADEA

106.    Plaintiff repeats and realleges paragraphs 1 through 105 of this Complaint as if fully set forth herein.

107.    By the acts and practices described above, defendant subjected plaintiff to unlawful age discrimination in violation of the ADEA.

108.    Defendant acted with malice and/or reckless disregard to plaintiff's rights protected under federal law.

109.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendant's discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)    Declaring that the acts and practices complained of herein violate Section 1981, Title VII, and the ADEA;

(b)    Enjoining and permanently restraining defendant from violating Section 1981, Title VII and the ADEA;

(c)    Directing defendant to take affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff;

(d)    Directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory treatment, and making her whole for

all the earnings and benefits she would have received but for defendant's discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, and other lost benefits;

(e)    Directing defendant to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

(f)    Directing defendant to pay plaintiff an additional amount as liquidated damages for lost wages;

(g)    Directing defendant to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's rights;

(h)    Awarding plaintiff reasonable attorneys' fees and costs;

(i)    Awarding plaintiff such interest as is allowed by law;

(j)    Granting plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and

(k)    Granting such other and further relief as the Court deems necessary and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, a trial by jury in this action.

Dated: October 15, 2024
      New York, New York

                                        VLADECK, RASKIN & CLARK, P.C.

                          By:        /s
                                    Jeremiah Iadevaia
                                    James Bagley
                                    111 Broadway, Suite 1505
                                    New York, New York 10006
                                    (212) 403-7300
                                    Attorneys for Plaintiff